**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 1 1 2018 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

AMILCAR GOMEZ,

                              Movant,

        v.                                              14-CV-5801 (SJ)

                                              **MEMORANDUM
UNITED STATES OF AMERICA,                      AND ORDER**

                              Respondent.

-------------------------------------------------------------x

APPEARANCES:

EDWARD IRIZARRY
260 Madison Avenue
New York, New York 10016
*Attorney for Movant*

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
By: Craig R. Heeren
*Attorney for Respondent*

**JOHNSON**, Senior District Judge:

        In March 2010, Amilcar Gomez ("Movant" or "Gomez") was convicted,

after a jury trial, of racketeering conspiracy, murder, and firearms possession and

sentenced to life imprisonment.  After exhausting his direct appeal, Movant brought

this motion pursuant to 28 U.S.C. § 2255, seeking to vacate or set aside his

conviction on the grounds that he was actually innocent of all three charges of

which he was convicted and that he was denied his Sixth Amendment right to

effective assistance of trial counsel. For the reasons set forth below, Movant's

motion is denied in its entirety.

## BACKGROUND

In a superceding indictment filed in 2007, Movant—a member of La Mara

Salvatrucha, a gang also known as "MS-13"—was charged with racketeering

conspiracy, murder in aid of racketeering and possession of a firearm in furtherance

of a "crime of violence." The first count alleged that Movant and co-defendant

David Berrios, another member of MS-13, conspired to violate the Racketeering

Influenced and Corrupt Organizations Act ("RICO") by agreeing to commit at least

two racketeering acts. Although the first count listed five racketeering acts, Movant

was alleged to have been involved in only two: the attempted murder of a "John

Doe #2"—later identified as Jeffrey Ronquillo Alvarado—on September 15, 2001,

and the murder of Pedro Martinez on March 1, 2003. Movant was separately

charged with aiding and abetting the Martinez murder and with firearm possession.

The "crime of violence" identified in the firearms possession count was not the

murder or attempted murder, but the racketeering conspiracy.

### The Trial

On March 30, 2009, Movant went on trial before the Court and jury. Over

the course of a week-long trial, the Government called 16 witnesses. The Court

need not discuss the testimony of every witness, but will briefly describe the

testimony which established Movant's involvement in MS-13 and his guilt of the crimes charged.

### Movant's Involvement in MS-13

Proof of Movant's involvement in MS-13 came primarily from two gang members who had agreed to cooperate with the Government: Evenigno Portillo, also known as "Peseta," and Wilmer Vindell-Betanco, also known as "Nica" or "Daffy." Portillo testified that he was a member of the Jamaica Centrales Loco Salvatruchas ("JCLS"), a clique of MS-13 which operated in Jamaica, Queens. (255, 261).[1] He recruited for the gang and specifically recalled having spoken to Movant—whom he knew by his nickname, "Goofy"—about the possibility of joining MS-13. (264).

Vindell-Betanco testified that he, too, was a member of MS-13, and was "brought ... into" the gang by Movant. (443). He came to know Movant through his younger brother, and recalled speaking to Movant about the gang in 2004 or 2005. (446-47). Vindell-Betanco specifically remembered that he first engaged in criminal activity with the gang in 2006 at a "hooky party"—a gathering held during school hours. After "Static," a member of the Bloods gang, appeared at the party, Movant told Vindell-Betanco to call his cousin, Yasser Jerez, also known as

---

[1] Numbers in parentheses denote pages in the trial transcript. Names preceding the numbers identify the witness whose testimony appears on the designated page.

"Payaso," and tell him to bring a gun. (450). The gun was then used to threaten "Static." (448-53).

After the party, Vindell-Betanco became better known by other members of the gang and, ultimately, was initiated into the gang. (455, 461). In the beginning of 2006, he attended his first gang meeting. (466). Although no one had been formally elected head, or "primero," of the clique at that time, Vindell-Betanco recalled that Movant led the meeting and acted as the leader. (466-67).

Both Portillo and Vindell-Betanco testified at length about MS-13 and its activities. Both stated that the gang charged dues, or "rent," which was used, among other things, to buy guns and other weapons. (Portillo: 264, 324; Vindell-Betanco: 471-72). The guns were used, *inter alia*, in drive-by shootings of gangs with which MS-13 was at war. (Vindell-Betanco: 474).

Vindell-Betanco specifically recalled a war with the Crips gang, which occurred after the Crips shot "Menace," a member of MS-13. (481). Vindell-Betanco bought a gun from the "primero" of another MS-13 clique and joined Jerez and other gang members in an attempt to shoot members of the Crips gang. (480-81). Vindell-Betanco testified that their purpose was to kill someone, but that the men never fired a shot because they were unsuccessful in locating a target. (481, 509).

### The September 15, 2001, Attempted Murder

The evidence of Movant's involvement in the attempted murder of Jeffrey Ronquillo Alvarado came principally from three members of MS-13: Portillo; his wife, Jennifer Orellano, also known as "Pirana;" and Denise Amador Serrano, also known as "Morena." All three testified that on September 15, 2001, they attended a meeting of the JCLS in a playground or park near J.H.S. 217 in Jamaica, Queens. (Portillo: 270; Orellano: 178; Serrano: 151). All three recalled that the meeting was attended by at least 20 gang members, and Portillo and Orellano both testified that Movant, also known as "Goofy," was at the meeting. (Portillo: 273; Orellano: 179-80).

At some point during the meeting, a lookout—a gang member nicknamed "Psycho"—screamed, signaling the approach of either the police or rival gang members, which MS-13 members called "chavalas." Psycho's alert was prompted by the approach of three teenagers: Alvarado, Carlos Illanes and David Valencia. Alvarado, who testified at trial, denied that he was ever in a gang, but admitted that he had never asked his friends if they were gang members. (127).

The teenagers immediately scattered, fleeing in different directions. (Portillo: 275). Portillo and Movant pursued one of them, along with two other members of the gang: Antonio Santos, also known as "Vietnam," and a male nicknamed "Snoopy." (Portillo: 275). Portillo reached the teenager first, knocked

5

him to the ground and began hitting and kicking him. (Portillo: 275). The three other gang members soon caught up and joined in the attack. According to Portillo, Movant and Snoopy struck the screaming teen with their hands and feet while Santos beat him with a stick. (Portillo: 275). Portillo testified that they were trying to kill him and told the victim, "You're going to die, chavala." (Portillo: 275-76).

Orellano and Serrano arrived at the scene shortly thereafter. Both recalled seeing Portillo, Santos and another person kicking a man as he lay on the ground. (Orellano: 183; Serrano: 169). Serrano claimed to be unable to identify the third man, but Orellano testified that she was "almost sure" it was Movant. (Orellano: 183; Serrano: 169).

According to Portillo, both Movant and Snoopy eventually pulled out knives, but only as the sound of sirens grew louder, heralding the approach of the police. (Portillo: 276-77). Both men said, "I'm going to kill you," and Movant "bent down, wanting to stab the guy." (Portillo: 276-78). He never acted on that impulse. Faced with the imminent arrival of the police, he fled the scene and threw the knife in the sewer. (Portillo: 278).

Portillo, Serrano and Orellano all encountered Movant again later that night. Portillo recalled that Movant said he was "happy because he had grabbed a chavala for the first time." (Portillo: 278-79). Serrano also recalled talking to Movant but claimed not to remember what he said, other than "something about him having ...

6

blood on his shoe." (Serrano: 159). Orellano recalled overhearing Movant talking to Portillo and Santos about the person they had beaten, and remembered that somebody said something about having blood on their shoes. (Orellana: 186).

Orellano met Movant again sometime after September 15, 2001. According to Orellano, Movant stated that he had move to Virginia after the incident "because he was scared about what had happened that night and didn't want to get arrested." (Orellano:188).

### The March 1, 2003, Murders

The evidence of Movant's involvement in the murder of Pedro Martinez came principally from three members of the New York City Police Department: Sergeant Greg Ostrowski and Officers John Kranenberg and Ralph Trico. The sergeant and Officer Kranenberg testified that they were on patrol in a marked police car at around 5:00 a.m. on March 1, 2003, when they received a radio call of an assault in progress at 149th Street and Jamaica Avenue, Queens. (Ostrowski: 344, 362-63; Kranenberg: 377). Since he was only a block away, Sgt. Ostrowski immediately drove to that intersection, where their car was flagged down by a man who gestured for them to go north on 149th Street. (Ostrowski: 345; Kranenberg: 377). The sergeant, who was driving the car, recalled only that the man appeared in distress, but could not remember if he was bleeding. (365). Kranenberg, who was

closer to the individual than the sergeant, testified that he was "covered in blood" and pointed up 149th Street, saying, "There's a fight up there." (377).

As the police car proceeded north, the policemen saw four men standing in the middle of 149th Street in the block north of Lowe Court. Both officers testified that the men were involved in an altercation, with three on one side and one on the other. (Ostrowski: 345-46; Kranenberg: 377). The officers had different perceptions of what was happening. The sergeant described it as a "schoolyard bully type match," with the three men pushing the other back as if to instigate a fight and the one individual "going back up to confront the other three." (345-46, 365). The officer described it as a "scuffle," with three men fighting another who was "frantically trying to block his attackers." (377).

As the police car was rolling to a stop, the officers saw one of the three men lunge at their adversary. (Ostrowski: 346; Kranenberg: 378). The sergeant testified that the man, who was dressed in a white long-sleeved T-shirt, "appeared to punch the other individual in the chest," and continued the "punching motion" as two other men looked on. (346-47). Kranenberg recalled that these two men were "blocking" the victim's arms while the man in the white shirt, standing in the middle of the three, was "lunging at his stomach." (378).

By all accounts, the assailants did not notice the police car until it pulled up to the scene. (Ostrowski: 366; Kranenberg: 379-80). The three men then fled south

8

on 149th Street, running past the police car in the direction of Lowe Court and Jamaica Avenue. (Ostrowski: 366-67; Kranenberg: 379). The other man looked at the officers and silently pointed to the blood on his shirt and at the man in the white shirt. (Kranenberg: 379).

Ostrowski and Kranenberg chased the fleeing individuals, two of whom made a right turn onto Lowe Court and one of whom continued running on 149th Street toward Jamaica Avenue. (Ostrowski: 345; Kranenberg: 377). The sergeant was in the process of transmitting a description of the men when another police car, occupied by Officer Ralph Trigo and his partner, turned off Jamaica Avenue and onto 149th Street. (Ostrowski: 349). Ostrowski radioed, "Stop that person running down the street," (Ostrowski: 349; Trigo: 371), then watched as the police car stopped and officers exited and approached the fleeing man. (Ostrowski: 349).

Although Ostrowski turned west onto Lowe Court before he saw the officers apprehend the man, (Ostrowski: 349), Trigo testified that he drew his gun and ordered the fleeing man to lay down. (371-72). The man complied and was promptly handcuffed. (372). At trial, Trigo identified Movant as the man he had arrested. (372). Ostrowski and other officers found the other two men hiding on 148th Street shortly thereafter. (Ostrowski: 350-51). Ostrowski identified a photograph of Adrian Soriano, also known as "Crazy," as depicting the person he had seen making "punching motions." (Ostrowski: 354; Portillo: 287).

9

The officers also took note of two victims. One was a "very bloody" Hispanic man, 5'6" to 5'7" tall and thin, who was walking or staggering around the corner of 149th Street and Jamaica Avenue. (Trigo: 374-75). The other, a heavyset Hispanic man who had been stabbed several times, was found lying next to Ostrowski's car. (Ostrowski: 352: Trigo: 373-74). Both were having trouble breathing. (Trigo: 374-75). According to Deputy Chief Medical Examiner Corinne Ambrosi, the victims—identified as Eduardo Lison and Pedro Martinez—both died in the hospital of sharp force injuries later on March 1, 2003. (Ambrosi: 417-18).

### Movant's Statements

Movant spoke to law enforcement agents on several occasions following his March 1, 2003, arrest. First, he was questioned by NYPD Detective Miriam Piretti while in custody on the afternoon of March 1, 2003. After initially denying that he was even at the scene of the crime, (Piretti: 397, 401), Movant claimed that he had not only witnessed the crimes, but events that preceded the crimes. In a written statement, Movant claimed that he was walking down a street when he saw four or five men beating "Crazy"—i.e., Soriano. (Piretti: 401). Most of the men fled when Soriano's friends "came to the rescue," but one was caught and beaten by Soriano's friends. (Piretti: 401). Although he claimed to be only a witness, Movant ran when the patrol cars arrived and was arrested. (Piretti: 401). Movant denied that

he was a member of MS-13, although he admitted that his brother, Philip, was a member of the gang. (Piretti: 401).

About two years later, in April 2005, Movant admitted his involvement in the gang and the murders to Erin Keegan, a U.S. Immigration and Customs Enforcement ("ICE") Agent employed in the "Violent Gang Unit." Keegan testified that she arrested Movant on the streets of Queens on April 19, 2005, and questioned him later that day. (Keegan: 522, 571-72). According to Keegan, Movant agreed to waive his *Miranda* rights and to speak without an attorney present. (Keegan: 522, 525). Movant then not only admitted that he was a member of MS-13, but claimed to be a recruiter for the gang. (Keegan: 523-25). He also told Keegan that members paid dues which were used to buy weapons, among other things, and that gang members gained respect within the gang by committing crimes, including murders and shootings. (Keegan: 524-25).

After Movant showed Keegan three burn marks on his forearm—a sign of affiliation with MS-13—and after Movant permitted Keegan to review the contacts on his cell phone, Keegan told Movant that she could help facilitate his release from custody if he would become "a source for the Government." (Keegan: 524-26). Movant responded that he was "open to continuing conversations with the Government." (Keegan: 526). Accordingly, Keegan questioned him again two days later. (Keegan: 526).

11

At the April 21, 2005, interview, Movant again waived his *Miranda* rights and discussed his involvement in MS-13. Movant admitted that he had participated in the March 1, 2003, murders; that he had purchased two guns for the gang on two separate occasions; and that he had participated in car thefts. (Keegan: 527-31). At the close of the interview, Keegan again stated that she would try to facilitate his release from custody if he would continue to cooperate with the Government. (531).

Movant spoke to Keegan on at least two occasions in June 2005, following his release from custody. (Keegan: 533). Those meetings took place at the U.S. Attorney's Office in Brooklyn, and were attended by other ICE agents and AUSA John "Jack" Smith. (Keegan: 533; Smith: 212). At the time of the meetings, Movant was not charged with anything and was told his attendance was voluntary. (Smith: 214). Since Movant was not in custody, Smith did not read him *Miranda* rights and did not discuss his right to counsel. (Smith: 232).

At the first of the meetings, Movant again admitted that he was a member of MS-13 and had purchased several guns for the gang, one of which was still in the possession of the JCLS clique. He not only admitted participating in the Martinez murder, (Keegan: 533-34; Smith: 221-23), but specifically admitted that he intended to kill Martinez when he and other gang members chased him down. (Smith: 224-25). Movant also stated that "Crazy"—whom he had previously

identified as Soriano and who had stabbed both of the victims—sent him a letter asking him to testify on his behalf. (Keegan: 535; Smith: 224).

During the June interviews, Movant admitted his involvement in three other stabbings of rival gang members and in armed robberies. (Keegan: 536-38; Smith: 226-28). According to Smith, the Government had no prior information relating to these stabbings. (Smith: 238). Keegan investigated the incidents Movant had reported, but was unable to corroborate Movant's allegations. (Keegan: 582-83).

Movant continued to cooperate with the Government thereafter, assisting in a "controlled buy" of a firearm from other gang members and recording gang meetings. (Keegan: 541, 543). However, he was eventually returned to custody after he violated some of the rules which ICE imposed on their cooperators. (Keegan: 539-41). Keegan testified that she learned of the rules violations— including Movant's failure to disclose all of his meetings and conversations with MS-13 members—from Vindell-Betanco, who became a cooperator after his arrest in 2007. (Keegan: 574-75).

**The Verdict and Appeal**

Based on the foregoing information and the other evidence offered at trial, the jury convicted Movant of all three of the offenses with which he was charged. On March 10, 2010, Movant was sentenced to 365 months' imprisonment for the racketeering conspiracy, 60 months' imprisonment for the firearms possession, and

life imprisonment for the murder of Pedro Matrinez. The first two terms were consecutive to one another, but concurrent to the term of life imprisonment.

Movant appealed his conviction on three grounds. First, Movant claimed that the Court violated his Sixth Amendment right to a public trial by excluding his family during the voir dire of prospective jurors. Second, he contended that the Court violated his due process right to a fair trial by proceeding to summations without expressly inquiring whether Movant wished to present a defense. Third, Movant argued that he was denied his Sixth Amendment right to the effective assistance of counsel because his attorney (a) failed to object to the exclusion of his family during voir dire, (b) failed to object to the evidence-closing procedure employed by the Court, and (c) failed to advise him of his right to testify at trial.

On January 15, 2013, the Second Circuit affirmed Movant's conviction, rejecting all of the arguments except the claim that Movant's attorney did not advise him of his right to testify. *United States v. Gomez*, 705 F.3d 68, 72 (2d Cir. 2013). The Court of Appeals found that claim to be "inappropriate for resolution" because "the record with regard to whether or not Gomez desired to testify, as well as with regard to the advice he received from counsel as to both his right to testify and his right to decide whether to do so... [was] entirely undeveloped." *Id.* at 80. The Second Circuit noted, however, that Movant could "bring a motion under 28 U.S.C. § 2255 in order to pursue this claim." *Id.*

14

**The Instant Motion**

Within a year after the Supreme Court denied his petition for a writ of certiorari, *Gomez v. United States*, 571 U.S. 817 (2013), Movant filed the instant motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. Gomez's Memorandum of Law in Support of the Motion ("Movant's Memo") principally contends that Movant was denied his Sixth Amendment right to effective assistance of counsel. However, the ineffective assistance claim does not rely solely on the contention that defense counsel failed to inform Movant of his right to testify or to effectuate his decision to testify. Rather, the motion contends that trial counsel's representation was also deficient because he failed 1) to investigate the circumstances surrounding the statements that Movant made to Keegan and Smith and to move to suppress these statements; 2) to interview Soriano or any of the witnesses to the Martinez murder and to call Soriano as a witness, even though he knew Soriano was prepared to testify that Movant had nothing to do with the murder; 3) to obtain documents and minutes relating to Movant's May 2005 deportation proceedings; 4) to cross examine all of the witnesses against Movant and 5) to demand blood or biological evidence recovered from the murder scene by the Crime Scene Unit.

The motion contains two other arguments that are embedded in the ineffective assistance point, but are actually separate claims. First, Movant argues

that he is actually innocent of all charges. Second, Movant argues that the Government violated its obligations under Rule 16 of the Federal Rules of Criminal Procedures and the Jencks Act, 18 U.S.C. § 3500, by failing to turn over evidence relating to Movant's deportation proceedings.

In support of his motion, Movant has attached 18 exhibits. These include a nine-page affidavit executed by Movant on September 19, 2014 ("Movant's Affidavit"); a seven-paragraph affirmation signed by Movant's trial counsel, Scott Yale Auster, on February 22, 2011 (the "Auster Affirmation"); and a nine-paragraph affidavit sworn by Adrian Soriano on July 27, 2013, shortly after Soriano pled guilty to manslaughter in New York State court and was sentenced to 23 years' imprisonment for stabbing Pedro Martinez (the "Soriano Affidavit"). Portions of these documents are discussed in more detail in the discussion that follows.

## DISCUSSION

Section 2255(a) provides, in pertinent part:

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or ... is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"[A] motion under § 2255 is not a substitute for direct appeal." *Sapia v. United States*, 433 F.3d 212, 217 (2d Cir. 2005). Ordinarily, a defendant must exhaust his direct appeal before filing a motion pursuant to § 2255. *United States v. Vilar*, 645 F.3d 543, 546 (2d Cir. 2011). However, "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003). In addition, the Supreme Court has held, "in the context of § 2255, that actual innocence may overcome a prisoner's failure to raise a constitutional objection on direct review." *McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013) (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)).

In this case, Movant raises both ineffective assistance of counsel and actual innocence claims. In addition, Movant argues that the Government violated Rule 16 of the Federal Rules of Criminal Procedure and the Jencks Act by failing to turn over evidence relating to Movant's immigration proceedings. *See* Movant's Memo, p. 23. This argument was not raised on direct appeal and "may not be raised on collateral review unless the [Movant] shows cause and prejudice" for the failure to do so. *Massaro*, 538 U.S. at 504. Since Movant has made no effort to show cause and prejudice, this argument is procedurally barred.

**I. Actual Innocence**

Movant's actual innocence argument appears to be based on a misreading of the superceding indictment. Movant asserts that the prosecution theory "was that Gomez was guilty of a murder when he used a firearm in furtherance of the Martinez stabbing." Movant's Memo, p. 22. Movant argues that no one had a gun during the Martinez murder, and that he lacked the requisite intent to kill. He further contends that he is "clearly" innocent of firearm possession charge because he did not carry a gun in furtherance of the Martinez stabbing. *Id.* Finally, Movant asserts that Soriano's Affidavit, Movant's own "explanation of his false confession" and inconsistencies in the testimony of the eyewitnesses established his actual innocence of the murder charge.

In fact, the superceding indictment never charged Movant with possessing or using a firearm in connection with the Martinez murder. Count Two of that indictment alleges that "[i]n or about and between January 1998 and October 2006," Movant and a co-defendant, David Berrios, "together with others, did knowingly and intentionally use and carry a firearm during and in relation to a crime of violence, to wit: the crime charged in Count One, and did knowingly and intentionally possess a firearm in furtherance of said crime of violence." Count One charges Movant and Berrios with a racketeering conspiracy, not the murder of Pedro Martinez. Moreover, Count Five—which charges that Movant, together with

18

others, murdered Martinez—makes no mention of the instrument used to commit the murder. Accordingly, the arguments that Movant could not have been guilty of Counts Two or Five because a gun was not used in the Martinez murder are baseless.

To the extent that Movant is arguing that his testimony or that of Adrian Soriano would have established his innocence, the Court disagrees. The proof of Movant's guilt was overwhelming. As discussed more fully below in connection with the ineffective assistance argument, it is very unlikely that self-serving testimony from Movant and/or testimony from the already-convicted Soriano would have affected the outcome of the trial.

## II. Ineffective Assistance of Counsel

The Sixth Amendment of the United States Constitution ensures that "in all criminal prosecutions, the accused shall ... have the Assistance of Counsel" for his defense. Although the Sixth Amendment does not expressly require that counsel be "effective," courts have found that the right to counsel inherently implies the right to effective assistance. As the Second Circuit has noted, the very "purpose of the Sixth Amendment guarantee of 'the Assistance of Counsel' ... is to ensure that defendants have effective assistance of counsel." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotations and citations omitted).

Federal law relating to effective assistance of counsel was clearly

established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668

(1984). That case established a two-pronged test for deciding ineffective assistance

claims. To satisfy the first prong, "the defendant must show that counsel's

representation fell below an objective standard of reasonableness." *Id.* at 688.

Specifically, "[a] convicted defendant ... must identify the acts or omissions of

counsel that are alleged not to have been the result of reasonable professional

judgment." *Id.* at 690.

To satisfy the second prong, a defendant must demonstrate "that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* at 694. The Supreme Court defines

"reasonable probability" as "a probability sufficient to undermine confidence in the

outcome." *Id.* "The level of prejudice the defendant need demonstrate lies between

prejudice that 'had some conceivable effect' and prejudice that 'more likely than

not altered the outcome in the case.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d

Cir. 2001) (quoting *Strickland*, 466 U.S. at 693).

"[A] petitioner cannot prevail on a claim of ineffective assistance merely

because he disagrees with his counsel's strategy." *Singleton v. Duncan*, No. 03-

CV-561, 2006 WL 73734, at *14 (E.D.N.Y. Jan. 10, 2006) (citing *Jones v. Barnes*,

463 U.S. 745, 752 (1983)). When applying the two-pronged test, "[j]udicial

scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Courts assessing whether counsel was ineffective "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* The burden is on the defendant to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955) (internal quotations omitted)).

"[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy." *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). However, ultimately, "[t]he relevant inquiry focuses 'on the fundamental fairness of the proceeding whose results are being challenged.'" *Bien v. Smith*, 546 F. Supp. 2d 26, 51 (E.D.N.Y. 2008) (quoting *Strickland*, 466 U.S. at 696). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

## A. The Failure to Request Blood and Biological Evidence

Movant argues that the representation provided by his trial attorney fell below an objective standard of reasonableness in six respects. First, Movant faults his trial counsel for failing to demand that blood or biological evidence recovered

21

from the scene of the Martinez stabbing be analyzed for the presence of his DNA. Movant asserts that this analysis would have established that the blood and biological evidence was from "multiple individuals other than Gomez" and "would have been presented to the jury as evidence of Gomez's actual innocence of the Martinez stabbing." Movant's Memo, p. 25. In the alternative, Movant requests that the Court either "consider any DNA test results from the recovery of any blood or tissue samples and order a new trial" or order DNA testing pursuant to 18 U.S.C. § 3600. *Id.*

There are obvious problems with this argument. First, while Detective Michael Cunningham of the NYPD's Crime Scene Unit testified that he recovered samples of blood from various locations—the sidewalk of Jamaica Avenue near 148th Street, the ground and a parked car further north on 148th Street, and a pay phone near 147th Street (617-18)—it is unclear that the blood was connected to the Martinez stabbing, as opposed to the Lison stabbing. Second, there is no evidence that any of the perpetrators of the attack on these two men were themselves cut or otherwise bloodied during the attacks. Third, even if there were, the presence of another perpetrator's blood would not establish Movant's innocence.

Given these problems, defense counsel cannot be faulted for failing to request that the blood and biological evidence be subjected to DNA testing. The Court would not have authorized DNA testing had defense counsel requested funds

22

to do so during trial, and will not order DNA testing now. Movant has produced no evidence that the proposed DNA testing could produce new material evidence that would support any theory of defense advanced by Movant or raise a reasonable probability that he did not commit the offense. *See* 18 U.S.C. § 3600(a)(8).

## B. The Failure to Cross-Examine Witnesses

Second, Movant argues that his trial counsel failed to confront the prosecution witnesses because he mistakenly believed that a Proffer Agreement between Movant and the Government precluded him from cross-examining them. Movant notes that the agreement, which is included in Exhibit 1 to the Government's Memorandum of Law in Opposition (the "Government's Opposition"), "simply allowed the prosecution to introduce Gomez's statements given during [the] proffer should his trial assertions be contrary to these statements." Movant's Memo, p. 24. Movant further notes that nothing in the agreement precluded defense counsel from questioning "a witness's credibility or ability to observe ... the alleged murder and attempted murder," and implies that defense counsel failed to do so because "the prosecution threatened to use Gomez's proffer statements against him." *Id.*

Movant does not, however, identify any specific instances in which defense counsel's cross examination was deficient. Even if Movant had identified deficiencies, it is unlikely that the deficiencies would have supported a claim of

ineffective assistance of counsel. "Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)) (omission in original). Movant, who has provided no evidence that defense counsel decided to forego any particular line of cross-examination because of the proffer agreement, has not met his burden of overcoming the presumption that counsel's cross-examination fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689.

## C. The Failure to Demand Records Relating to Movant's Immigration Case

Third, Movant claims that defense counsel should have obtained "any and all records pertaining to Keegan's processing of Gomez's deportation case" and "any and all statements or arrangements with said court for the release of Gomez as he cooperated with Keegan's investigation." Movant's Memo, p. 23. Movant asserts that unspecified "agents" threatened him with deportation and "summarily opposed Gomez's TPS argument" at immigration hearings on May 5 and 18, 2005. *Id.* He then implies that these threats and actions could have been used to seek suppression of the statements that Movant made to AUSA Smith in June 2005.

This argument is entirely without merit. First, the Court has listened to the audio recordings of the May 2005 deportation hearings, which are attached to

Movant Reply to the Government's Memorandum of Law in Opposition ("Movant's Reply") as Exhibit U, and finds that they do not support Movant's argument. At the May 5 hearing, an immigration judge notes that Movant's initial application for temporary protected status ("TPS") was denied years earlier and that his pending application for TPS is likely to be denied because he is ineligible for that status. At the May 18 hearing, the judge grants ICE's motion to administratively close the case but advises Movant that the case is not being dismissed and can be re-opened. The recording contains no threats or arguments by an ICE agent.

Second, Movant has not identified any other immigration records or statements by agents which would have been of assistance to the defense. Indeed, Movant implies that he cannot know if such records or statements even exist because the Government did not meet its obligations under Fed. R. Crim. P. 16 and 18 U.S.C. § 3500. The Government, however, claims that "immigration documents relevant to the case were turned over" and appends various documents to the Government's Opposition as Exhibits 2-4. Movant has not controverted the Government's claim, much less explained how documents that his attorney failed to obtain could have affected the outcome of his trial.

**D. The Failure to Conduct Discovery and to Move to Suppress Statements**

Fourth, Movant argues that his trial counsel was ineffective in failing 1) to conduct discovery regarding Movant's many statements to authorities and 2) to move to suppress the alleged confessions. In support of this argument, Movant has submitted an affidavit in which he states that when he was arrested on April 15, 2005—not April 19, 2005, as Keegan testified—he both asked to speak to a lawyer and requested access to a telephone so that he could call his lawyer. Movant's Affidavit (attached to Movant's Memo as Ex. A), ¶¶ 9-11. According to Movant, Keegan ignored those requests and resumed questioning him on April 19, 2005. *Id.*, ¶¶ 12-15. Having been repeatedly threatened with deportation to his native El Salvador and feeling "[e]xasperated, confused, pressured and afraid of deportation," Movant waived his *Miranda* rights and admitted his involvement in MS-13. *Id.*, ¶ 15.

Movant asserts that the ICE agents continued to disregard his request for a lawyer on April 21, 2005. Specifically, he states that the agents "continued to interrogate [him] and threaten [him] with immediate deportation," and that he was ultimately "coerced into signing documents" which waived his *Miranda* rights. *Id.*, ¶¶ 19-30. He then made "exaggerated statements about gang-related activities," allegedly because he "believed that by boasting [he] would appear more valuable to the agents and prevent his deportation." *Id.*, ¶¶ 31.

26

Assuming that Movant's statements are true, defense counsel might have had a meritorious basis for suppressing the statements which Movant made to Keegan in April 2005. It is well-settled that if a suspect requests counsel, all interrogation must cease until an attorney is present. *Miranda v. Arizona*, 384 U.S. 436, 484-85 (1966). The police may not resume questioning without making an attorney available to the defendant unless the defendant initiates further discussions with the police and knowingly and intelligently waives his right to counsel. *Smith v. Illinois*, 469 U.S. 91, 95 (1984). Movant states that he repeatedly requested an attorney and there is no indication that he subsequently initiated discussions with Keegan or other ICE agents.

In contrast, nothing in Movant's affidavit suggests a basis for moving to suppress the equally incriminating statements that Movant made to Keegan and AUSA Smith in June 2005. By that time, Movant had appeared in immigration proceedings at which he was represented by counsel and had been released from custody. Movant's Reply, Ex. U. While Movant was aware that he could be returned to custody and deported if he failed to cooperate with immigration authorities, Movant's Affidavit, ¶ 33, "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials." *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987). In light of the uncontroverted facts that Movant not only made a full confession to AUSA Smith

27

but surreptitiously tape recorded gang meetings thereafter, defense counsel had no basis for arguing that Movant's decision to cooperate in order to avoid deportation was not knowing and voluntary.  Unless defense counsel had a basis for suppressing the June 2005 statements to AUSA Smith, suppressing the April 2005 statements to Keegan would have been largely futile because the April and June statement were so similar.

Even if defense counsel had succeeded in suppressing the statements that Movant made to Keegan, there is not a reasonable probability that the result of Movant's trial would have been different.  The proof of Movant's involvement in MS-13 was established by the testimony of several gang members and by Movant's statements to AUSA Smith.  Portillo and Orellano both testified that they saw Movant hitting and kicking Alvarado, and both Orellano and a third gang member, Denise Serrano remembered overhearing Movant talking about having "blood on his shoe" after the attack.  (Serrano: 159; Orellana: 186).  Sgt. Ostrowski and Officer Kranenberg both personally witnessed Movant participating in the attack on Martinez and a third police officer caught Movant fleeing from the scene.  AUSA Smith testified that Movant not only admitted his intent to kill Martinez, but also stated that he had purchased several guns, one of which remained in the possession

of the JCLS clique. In light of this ample evidence of Movant's guilt of the crimes charged, Movant's statements to Keegan were not essential to the prosecution case.

**E. The Failure to Interview and Call Soriano**

Fifth, Movant argues that his trial counsel provided ineffective assistance because he failed to interview and call Adrian Soriano—the gang member who fatally stabbed Martinez on March 1, 2003. In support of this argument, Movant relies primarily on the Soriano Affidavit, which was sworn after Soriano pled guilty to manslaughter in connection with the stabbing of Pedro Martinez and was sentenced to 23 years' imprisonment. Soriano Affidavit (attached to Movant's Memo as Ex. N), ¶ 1 & p. 2. In his affidavit, Soriano states that Movant was "drunk on the night in question" and "had nothing to do with Pedro Martinez's death." *Id.*, ¶¶ 3, 5. Soriano asserts that Movant "did not possess a gun or knife," was "not aware" that Soriano had a knife and had stabbed Martinez, and "did not aid or assist [Soriano] in any way or ... in causing the death of Pedro Martinez." *Id.*, ¶¶ 3-5.

There are several problems with this argument. First, there is no evidence that trial counsel was timely notified of Soriano's willingness to testify. To the contrary, Movant's own affidavit states that he told his attorney that he "had witnesses that wanted to testify on [his] behalf," but not until "the start of [his] trial." Movant's Memo, Ex. A, ¶ 2. Indeed, just before voir dire began, defense

29

counsel informed the Court that Movant was not ready for trial because he wanted "to speak to two additional witnesses on his behalf." (3). The Court declined to delay the start of trial. (3).

Second, even assuming that Movant timely informed his trial attorney of Soriano's willingness to testify, his decision not to call Soriano as a witness would not have constituted ineffective assistance of counsel. "The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam). Because courts are "especially hesitant to disturb such 'strategic' decisions," *Pavel v. Hollins*, 261 F.3d 210, 217 (2d Cir. 2001), "[c]ourts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury." *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005). Thus, a trial "counsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'" *Id.* (quoting *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000)).

In this case, the decision not to call Soriano would not have been objectively unreasonable. Soriano would not have been permitted to testify to some of the assertions in his affidavit. He could not have offered conclusory testimony that Movant was "drunk." He also could not have testified to Movant's knowledge of

30

whether Soriano had a knife or had stabbed Martinez. Furthermore, it is unclear whether Soriano had the basis of knowledge to testify that Movant himself was unarmed on the evening of March 1, 2003.

To be sure, Soriano could have testified to his observations of Movant that evening. However, his claims that Movant "had nothing to do with Pedro Martinez's death" and "did not aid or assist" Soriano in any way would have been contradicted by the testimony of Ostrowski and Kranenberg, both of whom testified regarding Movant's involvement in the altercation with Martinez. The officers' testimony would have also contradicted Soriano's claim that Movant was "drunk" by showing that Movant was not too intoxicated to help catch Matrinez and to flee from the scene after the police arrived. It is highly unlikely that the jury would have credited Soriano's testimony over that of the NYPD officers.

To the extent that Soriano's testimony was consistent with that of the officers, it would not have helped Movant's case. At a minimum, it would have established that Movant was a member of MS-13 and with Soriano at some point during the evening of March 1, 2005. It would have also opened the door to cross-examining Soriano about his letter requesting that Movant testify on his behalf. This testimony would have hurt Movant's case far more than it would have helped..

Even if the Court were to find that Movant's attorney's decision not to call Soriano was objective unreasonable, it could not find that it affected the outcome of

31

the trial. As noted above, the evidence of Movant's involvement in the Martinez murder was established by the testimony of three police officers, one of whom arrested Movant as he was fleeing from the scene. Soriano's testimony, therefore, could not establish that Movant was not present, but only that Movant himself did not stab Martinez. This testimony, however, would have been entirely consistent with the Government's theory that Movant merely aided and abetted in the murder. (667).

**F. The Failure to Advise Movant of his Right to Testify and to Effectuate his Choice**

Sixth, Movant argues that his attorney failed to inform him of his right to testify and failed to effectuate Movant's decision to testify on his own behalf. In support of this argument, Movant has submitted his own affidavit in which he states that he told his trial counsel both at the start of trial and at the close of the Government's case that he wanted to testify. Movant's Affidavit, ¶¶ 2, 39. Movant did not advise the Court of this, however, because he believed that the decision as to whether he should testify was his lawyer's and that only his lawyer could speak for him in Court. *Id.*, ¶ 39.

Movant has submitted an affirmation from his trial counsel, which partially corroborates some of Movant's statements. The attorney confirms that Movant "did express ... his desire to testify, but only "[a]fter the Government rested its

case." Auster Affirmation (attached to Movant's Memo as Ex. L), ¶ 2. Movant's counsel further admits that he "never placed on the record Mr. Gomez's desire to testify" and never told Movant "that the decision to testify was his alone to make." *Id.*, ¶ 4.

The evidence submitted by Movant may be sufficient to make out the first prong of the *Strickland* test. In *Brown v. Artuz*, 124 F.3d 73 (2d Cir. 1997), the Second Circuit held not only that a criminal defendant has the right to decide whether to testify, but also that defense counsel has a duty to inform the defendant of that right. *See id.* at 78-79. As the *Brown* Court stated:

> [D]efense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify.... Although counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying, and may strongly advise the course that counsel thinks best, counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter.

*Id.* at 79 (internal quotation marks and citation omitted)

In this case, Movant claims—and his trial attorney confirms—that defense counsel never informed Movant that he had the right to decide whether or not to testify. In addition, both Movant and his attorney agree that Movant expressed a desire to testify, but that the attorney never advised the Court of this fact. This

evidence may establish that counsel's performance was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

The evidence is not sufficient, however, to make out the second prong of the *Strickland* test: that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Movant argues that if he had testified, he would have 1) denied having the intent to kill anyone on March 1, 2005; 2) clarified for the jury that he feared deportation to his native El Salvador and felt coerced into making statements to the Government and 3) stated that he "did not possess a firearm of any kind in furtherance of a crime of violence as charged against [him]." Movant's Affidavit, ¶¶ 24-26. All of this testimony was unnecessary and likely would have been counterproductive.

First, it was not Movant's burden to establish that he lacked the intent to kill Martinez. By entering his "not guilty" plea, Movant denied each and every element of the crimes charged, including the *mens rea* element of the murder count. Having already implicitly denied the intent to kill Martinez, it was unnecessary for him to do so again explicitly. Moreover, testifying regarding intent would likely have subjected him to potentially damaging cross-examination, highlighting his admission to AUSA Smith about intending to kill Martinez when he chased him

down. (Smith: 224-25). It also would have opened the door to the admission of any contrary statements which he might have made during his proffer session.

Second, the jury was already aware from Keegan's testimony that Movant made statements to, and otherwise cooperated with, ICE agents in order to avoid legal consequences stemming from his arrest. The jury was not informed, however, that Movant was an illegal immigrant who was subject to deportation because of his prior convictions. Given the anti-immigrant sentiment that has recently gripped the nation, it was certainly not in Movant's interests to reveal the precise legal jeopardy which he faced when he agreed to cooperate. Indeed, his attorney was able to argue that Movant's statements were exaggerated and untrustworthy without Movant's proposed testimony.

Third, Movant did not need to point out that neither he nor any other gang member possessed a gun at the time of the attempted murder and murder charged in the superceding indictment. As discussed below, the "crime of violence" referenced in the gun possession charge was the racketeering conspiracy alleged in Count One of that indictment, not the murder or attempted murder. To be sure, Movant could have testified that his confessions were coerced and that his claims about possessing firearms were false. However, that strategy would have opened the door to questioning regarding the extent and nature of his cooperation, as well as the introduction of the Proffer Agreement (included in Exhibit A to the

Government's Memo) and cross-examination using any inconsistent statement he made during the proffer session. That testimony and cross-examination likely would have debunked Movant's claim that he was coerced into giving statements to the Government by establishing that it was a rational, voluntary decision.

## CONCLUSION

For the reasons set forth above the Court concludes that Movant has not established ineffective assistance of counsel or that he was actually innocent of any of the crimes charged. Accordingly, Movant's motion to vacate or set aside the March 23, 2010, judgment of conviction in *United States v. Gomez*, 06-CR-613 (SJ), is denied. Because Movant has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c)(2).

SO ORDERED.

/s/(SJ)

Dated: May 10, 2018
Brooklyn, New York

Sterling Johnson, Jr., U.S.D.J.